**STATE of Alaska, Petitioner,**

v.

**Jack L. BELTZ, Respondent.**

**No. A–9496.**

Court of Appeals of Alaska.

June 8, 2007.

---

Terisia K. Chleborad, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg and David W. Márquez, Attorneys General, Juneau, for the Petitioner.

A. Lee Petersen, Petersen Professional Corp., Willow, for the Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## *OPINION*

COATS, Chief Judge.

This case raises the question of whether, under Article I, Section 14 of the Alaska Constitution, which prohibits illegal searches and seizures, a person has a reasonable expectation of privacy in garbage that is set out at the end of a driveway for routine trash collection. We conclude that the Alaska Supreme Court's decision in *Smith v. State*[1] resolves this question, and that there is no reasonable expectation of privacy in this situation. Accordingly, we reverse the suppression order and remand the case for further proceedings.

*Factual and procedural background*

In October 2004, employees of the Wasilla Carrs grocery store reported to the Alaska State Troopers that a Native adult male was making repeated purchases of items that are commonly used to manufacture methamphetamine, including three boxes of Sudafed and thirteen boxes of book matches. Based on the fact that a Carrs club card belonging to Jack Beltz's father was used when purchasing these items, and on the witnesses' physical descriptions of the buyer, police suspected that Jack Beltz was the purchaser. Two of the Carrs employees also identified Beltz as the purchaser from a photo lineup.

After the Carrs employees identified Beltz as the purchaser of the suspected methamphetamine ingredients, Alaska State Trooper Kyle Young drove out to Beltz's residence in Wasilla. Beltz lived in a single-family home in Wasilla with his father. While driving by Beltz's house, Trooper Young noticed several garbage cans at the end of Beltz's driveway. Trooper Young returned to Beltz's residence in the early morning hours of October 21, accompanied by Palmer Police Officer Dwayne Shelton, an investigator with the Mat–Su Drug Unit. Without a search warrant, Trooper Young and Officer Shelton took two large black garbage bags from one of the trash cans at the end of Beltz's driveway. Before Trooper Young and Officer Shelton could take the rest of the garbage bags, they noticed some lights being turned on inside Beltz's residence, so they left with the intention of returning later to finish the task. When Trooper Young and Officer Shelton returned about an hour later, they observed that someone was awake inside Beltz's residence watching television. Trooper Young and Officer Shelton decided to leave and return later in the morning with the local refuse collection company in order to obtain the rest of the garbage.

That morning, Officer Shelton accompanied the trash collector as he made his scheduled weekly trip to Beltz's neighborhood. They picked up Beltz's remaining trash. The trash collector, at Officer Shelton's request, deliberately isolated Beltz's trash from the rest of the trash in his truck by segregating it in the front hopper of the garbage truck. When Trooper Young and Officer Shelton obtained this trash, they observed that between the time they had seized the original bags of trash earlier that morning and the

1. 510 P.2d 793 (Alaska 1973), *cert. denied*, 414 U.S. 1086, 94 S.Ct. 603, 38 L.Ed.2d 489 (1973).

time the garbage collector returned to take away the remaining trash, someone had filled the trash can again with more garbage.

Trooper Young and Officer Shelton proceeded to examine the trash bags at the drug unit investigator offices. The two bags contained "numerous items that [would be] used in the process to make meth[amphetamine]," including eleven bottles or plastic containers with liquid or solid methamphetamine lab waste and byproduct, one empty container of Coleman fuel, one empty acetone can, hundreds of matchbook covers with the striker plates removed, seven empty containers of HEET, twelve empty bottles of cold allergy tablets, stained coffee filters, stained tubing, and stained latex gloves. Over the course of the next several weeks, Trooper Young and other investigators—working with the trash collector in the same manner as before—took more trash from Beltz's residence, but found no more methamphetamine-related items.

In December 2004, Trooper Young obtained a warrant to search the Beltz residence. Trooper Young and Officer Shelton contacted Beltz at his residence; Beltz allowed them to come inside, and Trooper Young conducted a non-custodial, recorded interview with Beltz. Trooper Young reported that Beltz admitted he had purchased multiple items that he knew were being used to manufacture methamphetamine. Beltz indicated to Trooper Young that other people had paid him to shop for these items. According to Trooper Young, Beltz also admitted that he had allowed a friend to "cook" methamphetamine at his house on one occasion. Beltz told Trooper Young that he threw out the items used in the manufacturing process when the friend was finished, but discovered that someone had removed several trash bags from the trash can after he threw the items out. Trooper Young reported that Beltz told him that he suspected the police had taken the trash, and "that it was only a matter of time before they were caught." As a result, Beltz had ended his association with the individuals involved with manufacturing methamphetamine.

Beltz then consented to a search of his residence, but the investigators did not find any evidence of methamphetamine or methamphetamine manufacturing at the residence.

Beltz was subsequently indicted on four charges of misconduct involving a controlled substance in the second degree.[2] Beltz moved to suppress all evidence that investigators had obtained by seizing his trash and interviewing him in December 2004.

Superior Court Judge Beverly W. Cutler conducted a three-day evidentiary hearing on the motion to suppress. At the evidentiary hearing, Trooper Young testified that when he gathered up the trash from Beltz's trash cans, the cans were located where the driveway met the road. He also testified that the trash cans were in a cart and that there were several other garbage bags on top of and around the cans, but still inside the cart. (The garbage cans were apparently secured inside the cart with a bungee cord.)

After considerable evidence and argument concerning the location of the cart, Judge Cutler concluded that the cart was not on private property. Nevertheless, she ruled that, under the circumstances, the police had no right to conduct a warrantless search of Beltz's garbage. She concluded that Beltz had a reasonable expectation of privacy in the trash and granted Beltz's motion to suppress all of the evidence that resulted from the police seizure of Beltz's trash. The State filed a petition for review with this court. We granted review and now reverse Judge Cutler's decision.

*Why we conclude that the police could legally search Beltz's trash without a warrant under the United States Constitution*

 First, as a preliminary matter, under the Fourth Amendment to the United States Constitution, Beltz had no reasonable expectation of privacy in his trash placed at the end of his driveway for collection. In *California v. Greenwood*,[3] the United States Supreme Court held that police seizure of garbage that had been routinely collected is not

---

**2.** AS 11.71.020(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).

**3.** 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).

subject to the warrant requirements of the Fourth Amendment to the United States Constitution.[4]

In *Greenwood*, police asked the neighborhood trash collector to pick up Greenwood's trash, which Greenwood had left on the curb in front of his house for routine collection.[5] The trash collector then picked up Greenwood's trash and turned it over to police investigators. The police searched Greenwood's trash bags without a warrant. Based on evidence of narcotics trafficking they discovered in the trash, the police obtained a search warrant, conducted a search of Greenwood's home, and discovered controlled substances in the search.[6] Greenwood was arrested. After Greenwood posted bail, the police continued to receive information that late-night visitors were frequenting Greenwood's home; thus, police again collected his garbage, which contained more evidence of drug use. Based on this evidence, a second search warrant was issued, more drug evidence was found, and Greenwood was again arrested.[7]

The United States Supreme Court reversed the California Court of Appeals, which had affirmed suppression of the evidence.[8] Citing Justice Harlan's concurrence in *Katz v. United States*,[9] the Court first explained that "[t]he warrantless search and seizure of the garbage bags left at the curb outside the Greenwood house would violate the Fourth Amendment only if [Greenwood] manifested a subjective expectation of privacy in [his] garbage that society accepts as objectively reasonable."[10] The Court concluded that, although Greenwood may have had an expectation that the police would not search his trash before it was picked up and

hauled to the dump, the Court found that Greenwood "could have had no reasonable expectation of privacy in the inculpatory items that [he] discarded."[11] The Court based this finding on the rationale that

[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public.... Moreover, [Greenwood] placed [his] refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through [Greenwood's] trash or permitted others, such as the police, to do so.[12]

The Court also reasoned that "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public."[13] The Court concluded that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties,"[14] and "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."[15]

The Court's decision in *Greenwood* disposes of Beltz's claim under the Fourth Amendment. It is true that *Greenwood* could be distinguished because a garbage collector, acting as an agent of the police, picked up Greenwood's trash and then turned it over to the police. In Beltz's case the police seized some of Beltz's trash themselves. But this does not seem to us to be a constitutionally significant distinction. We find persuasive the Supreme Court of New Jersey's state-

4. *Id.*, 486 U.S. at 43–44, 108 S.Ct. at 1630–31.

5. *Id.*, 486 U.S. at 37, 108 S.Ct. at 1627.

6. *Id.*, 486 U.S. at 37–38, 108 S.Ct. at 1627.

7. *Id.*, 486 U.S. at 38, 108 S.Ct. at 1627–28.

8. *Id.*, 486 U.S. at 38–39, 108 S.Ct. at 1628.

9. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

10. *Greenwood*, 486 U.S. at 39, 108 S.Ct. at 1628 (citations omitted).

11. *Id.*, 486 U.S. at 40–41, 108 S.Ct. at 1628–29.

12. *Id.*, 486 U.S. at 40, 108 S.Ct. at 1628–29 (footnotes and citations omitted).

13. *Id.*, 486 U.S. at 41, 108 S.Ct. at 1629.

14. *Id.*, 486 U.S. at 41, 108 S.Ct. at 1629 (quoting *Smith v. Maryland*, 442 U.S. 735, 743–44, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220 (1979)).

15. *Id.* (quoting *Katz*, 389 U.S. at 351, 88 S.Ct. at 511).

ment in *State v. Hempele*[16] that "removal of trash by garbage collectors who, minutes later, turn the trash over to the police is no different from direct removal of the same trash by the police themselves." [17]

*Why we conclude the police could legally search Beltz's trash without a warrant under the Alaska Constitution*

■ We now turn to Beltz's claim under the Alaska Constitution.[18] Fifteen years prior to the *Greenwood* decision, the Alaska Supreme Court decided *Smith v. State.*[19] The court held that the police could search, without a warrant, a tenant's trash which had been deposited in a dumpster that accommodated several apartments.[20] The dumpster was located outside of the apartment building in Anchorage and the Municipality made routine garbage pickups from the dumpster.[21] Like the United States Supreme Court later did in *Greenwood,* the Alaska Supreme Court based its analysis on Justice Harlan's concurring opinion in *Katz.*[22] The court concluded that even if Smith had an actual subjective expectation of privacy, it was unable to hold that society was prepared to recognize this expectation of privacy as reasonable.[23]

To reach this conclusion, the supreme court first examined Smith's clear intent to abandon the garbage. The court stated that

"the protection of the Fourth Amendment does not extend to abandoned property. Using traditional property law concepts, we find it difficult to avoid the conclusion that any items of garbage placed in a recepta[c]le outside the dwelling ... are abandoned." [24]

The supreme court concluded that "the sequence of an individual's placing an article in a receptacle, from which routine municipal collections are made, and then withdrawing from the area [is] activity clearly indicative of 'an intention to relinquish all title, possession, or claim to property.' " [25] The supreme court differentiated this situation from one in which "property ... is abandoned but ... rests in a receptacle temporarily maintained inside a dwelling," which could not be searched without a warrant.[26]

But the court did not find the fact that Smith had abandoned the property entirely conclusive as to whether the police had conducted a reasonable search.[27] After reviewing several United States Supreme Court cases analyzing the search of trash, the supreme court concluded that even if Smith had abandoned the trash, the search would still be illegal if she harbored a "reasonable expectation of privacy" in the dumpster.[28] The supreme court applied a two-part analysis to determine whether Smith had a reasonable expectation of privacy in the trash

---

**16.** 120 N.J. 182, 576 A.2d 793 (1990).

**17.** *Id.* at 798–99 (rejecting the argument that the defendant had a reasonable expectation of privacy in garbage left at the curb under the federal constitution in light of *Greenwood,* but concluding that such a right did exist under the state constitution). *See also United States v. Webb,* 890 F.2d 420, unpublished, 1989 WL 145383 at *1–2 (9th Cir.1989) (holding that Alaska State Trooper who took two opaque sealed garbage bags set near the street outside the defendant's home without a search warrant did not violate the Fourth Amendment prohibition against warrantless searches and seizures); (1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.6(c) at 698 (4th ed.2004)) (noting that the "reasoning [the Supreme Court applied in *Greenwood* ] supports the conclusion that the result would be the same if the police themselves had intruded into garbage bags so located") (footnote omitted).

**18.** Art. I, § 14 (right against unreasonable searches and seizures) and art. I, § 22 (right to privacy).

**19.** 510 P.2d 793.

**20.** *Id.* at 798–99.

**21.** *Id.*

**22.** *Id.* at 797 (citing *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring)).

**23.** *Id.*

**24.** *Id.* at 795 (footnote omitted).

**25.** *Id.* at 796 (quoting Edward G. Mascolo, *The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis,* 20 Buff. L.Rev. 399, 401 (1970)) (footnote omitted).

**26.** *Id.* at 795 n. 7.

**27.** *Id.* at 796.

**28.** *Id.*

placed in the dumpster: first, whether Smith had an actual, subjective expectation of privacy in the trash, and second, whether this expectation was one that society was prepared to recognize as reasonable.[29] After reviewing the facts of Smith's case the supreme court concluded that Smith did not have a subjective expectation of privacy in the trash in the dumpster.[30] But even if she had, the court concluded that this expectation was not one that society was prepared to recognize as reasonable.[31]

In reaching this conclusion, the court identified four factors relevant to the question of whether society is prepared to recognize a reasonable expectation of privacy in trash: (1) where the trash was located; (2) whether the dwelling consisted of multiple units or a single unit; (3) who removed the trash; and (4) where the search of the trash took place.[32] The supreme court explained:

> One may readily arrange these factors to form a continuum. At one end of the continuum is trash located close to a single-family dwelling, on the same property as the dwelling, and searched by police officers at that location. We observe, without so deciding, that this would be a strong case for holding the expectation of privacy to be reasonable. At the other end of the continuum is trash located off the premises of a multiple-unit dwelling, and searched by a person authorized to remove it. In such a case we would be unable to hold that the expectation of privacy was reasonable.[33]

The supreme court placed the dumpster at issue at the end of the continuum not encompassing a right to privacy because: first, the "dumpster accommodated several apartments," giving "many people living in the building—[including] the superintendent—

... occasion to scavenge about in the collective heap"; second, "all municipal pickups were made from this dumpster" and thus "any tenant ... could be sure that periodically a group of third persons would look into the dumpster and possibly scavenge items therefrom"; and finally, that "the dumpster was located outside the building in the parking area ... [where] it would be reasonable to expect trash to be accidently removed from the dumpster by running children, passing cars, stray dogs, or even a visitor of another tenant in the building."[34] Based on these factors, the supreme court held that Smith could not have "harbored an objectively reasonable expectation of privacy."[35]

Chief Justice Rabinowitz strongly dissented, arguing that the warrantless search of Smith's garbage violated both the United States and Alaska constitutions.[36] We note that Professor LaFave in his treatise on search and seizure agrees with Chief Justice Rabinowitz's dissent.[37]

Beltz relies on a statement by the majority in *Smith* that there is a "strong case for holding the expectation of privacy to be reasonable" where the trash is "located close to a single-family dwelling, on the same property as the dwelling, and searched by police officers at that location."[38] *Smith* noted this point, but explicitly did not reach this holding. And although it is true that Beltz lived in a single-family home, we think that his action of placing his trash in plain view at the end of his driveway, where, as in *Smith*, it was left for routine collection and could easily have been scavenged or accidentally removed, showed that Beltz did not harbor a reasonable expectation of privacy in the trash.[39]

We conclude that *Smith* requires us to hold that Beltz did not have a reasonable

29. *Id.*

30. *Id.*

31. *Id.*

32. *Id.* at 797–98.

33. *Id.*

34. *Id.* at 798.

35. *Id.* (footnote omitted).

36. *Id.* at 799 (Rabinowitz, C.J., dissenting).

37. 1 LaFave, *Search and Seizure*, § 2.6(c) at 692, 701 (quoting extensively from Chief Justice Rabinowitz's dissent).

38. *Smith*, 510 P.2d at 798.

39. *Id.*

expectation of privacy in his trash. However, we recognize that, in *Smith*, the supreme court stated that it was "profoundly committed to the preservation of personal privacy" and that it was "unwilling to announce a general rule sanctioning official gathering and analysis of an individual's refuse."[40] Therefore the supreme court specifically limited its holding to the particular facts of the case before it. Furthermore, there was a strong dissent in *Smith*, and the dissent is supported by Professor LaFave. In addition, the decision in *Smith* is over thirty years old. Since that time, many courts have struggled with the issue of whether a person has a reasonable expectation of privacy in trash. Although the majority of courts follow the reasoning of the United States Supreme Court,[41] some courts have concluded that society should recognize that a person

has a reasonable expectation of privacy in trash.[42] In particular, courts have recognized that, with the advance of technology, the police can learn a great deal about a person's life and associations, including even obtaining DNA for testing and for investigation.[43] Some courts have attempted to limit the ability of the police to investigate a person's garbage by at least requiring the state to have reasonable suspicion as a prerequisite to a warrantless search.[44]

We certainly recognize that allowing the police to search a person's trash without limitation raises serious concerns that could threaten an individual's right to privacy. But we consider the *Smith* case to be controlling. And *Smith* is certainly consistent with the decisions of the United States Supreme Court interpreting the United States

40. *Id.* at 795.

41. *See Walls v. State*, 536 So.2d 137, 139 (Ala.Cr. App.1988); *Rikard v. State*, 354 Ark. 345, 123 S.W.3d 114, 119 (2003); *State v. Fassler*, 108 Ariz. 586, 503 P.2d 807, 813–14 (1972); *People v. Hillman*, 834 P.2d 1271, 1277 (Colo.1992); *State v. DeFusco*, 224 Conn. 627, 620 A.2d 746, 751 (1993); *State v. Fisher*, 591 So.2d 1049, 1051 (Fla.Dist.App.1991); *Perkins v. State*, 197 Ga. App. 577, 398 S.E.2d 702, 704 (1990); *State v. Donato*, 135 Idaho 469, 20 P.3d 5, 10 (2001); *People v. Collins*, 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267, 279 (1985), *rev'd on other grounds by Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); *State v. Henderson*, 435 N.W.2d 394, 396 (Iowa App. 1988); *State v. Kimberlin*, 267 Kan. 659, 984 P.2d 141, 146 (1999); *State v. Strickland*, 683 So.2d 218, 228–29 (La.1996); *State v. Sampson*, 362 Md. 438, 765 A.2d 629, 636 (2001); *Commonwealth v. Pratt*, 407 Mass. 647, 555 N.E.2d 559, 567 (1990); *People v. Pinnix*, 174 Mich.App. 445, 436 N.W.2d 692, 694 (1989); *State v. Texel*, 230 Neb. 810, 433 N.W.2d 541, 543 (1989); *State v. Hauser*, 342 N.C. 382, 464 S.E.2d 443, 447 (1995); *State v. Rydberg*, 519 N.W.2d 306, 310 (N.D.1994); *State v. Brown*, 20 Ohio App.3d 36, 484 N.E.2d 215, 217–18 (Oh.App.1984); *Cooks v. State*, 699 P.2d 653, 656 (Okla.Crim.App.1985); *State v. Briggs*, 756 A.2d 731, 743 (R.I.2000); *State v. Schwartz*, 689 N.W.2d 430, 436 (S.D. 2004); *Levario v. State*, 964 S.W.2d 290, 296 (Tex.App.1997); *State v. Jackson*, 937 P.2d 545, 550 (Utah App.1997); *State v. Stevens*, 123 Wis.2d 303, 367 N.W.2d 788, 796–97 (1985); *Croker v. State*, 477 P.2d 122, 125 (Wyo.1970).

42. *See People v. Krivda*, 5 Cal.3d 357, 96 Cal. Rptr. 62, 486 P.2d 1262, 1268–69 (1971), *vacated and remanded*, 409 U.S. 33, 93 S.Ct. 32, 34

L.Ed.2d 45 (1972), *reaff'd*, 8 Cal.3d 623, 105 Cal.Rptr. 521, 504 P.2d 457 (1973), *cert. denied*, 412 U.S. 919, 93 S.Ct. 2734, 37 L.Ed.2d 145 (1973); *State v. Tanaka*, 67 Haw. 658, 701 P.2d 1274, 1276–77 (1985); *State v. Goss*, 150 N.H. 46, 834 A.2d 316, 319 (2003); *State v. Hempele*, 120 N.J. 182, 576 A.2d 793, 810 (N.J.1990); *State v. Granville*, 140 N.M. 345, 142 P.3d 933, 942 (N.M.App.2006), *cert. granted*, 140 N.M. 423, 143 P.3d 185 (2006); *State v. Morris*, 165 Vt. 111, 680 A.2d 90, 94–95 (1996); *State v. Boland*, 115 Wash.2d 571, 800 P.2d 1112, 1117 (1990). *See also State v. Rhodes*, 151 N.C.App. 208, 565 S.E.2d 266, 270–71 (2002) (differentiating *Hauser*, 464 S.E.2d at 447, which upheld search of trash in backyard that was a designated spot for trash collection, and holding that warrantless police search of trash bags located "immediately beside the steps that led to the side-entry door of defendant's house" and not intended for immediate municipal refuse collection violated Fourth Amendment protection).

43. *See, e.g., Tanaka*, 701 P.2d at 1276–77; *Hempele*, 576 A.2d at 802–03; *Granville*, 142 P.3d at 941. *See also State v. A Blue in Color, 1993 Chevrolet Pickup*, 328 Mont. 10, 116 P.3d 800, 806–07 (2005) (Nelson, J., concurring); 1 La-Fave, *Search and Seizure*, § 2.6(c) at 692.

44. *See Litchfield v. State*, 824 N.E.2d 356, 363–64 (Ind.2005) (holding that a warrantless search of garbage is reasonable if there is "articulable individualized suspicion" that garbage will contain evidence of criminal activity and garbage is retrieved in substantially the same manner as the trash collector would take it); *A Blue in Color, 1993 Chevrolet Pickup*, 116 P.3d at 804–05 (adopting *Litchfield* rule as a matter of state constitutional law).

Constitution.[45] We feel that we are bound by *Smith*. Whether *Smith* should be modified is an issue for the Supreme Court of Alaska.

*Conclusion*

We accordingly conclude that, under the United States and Alaska Constitutions, Beltz had no reasonable expectation of privacy in the trash which he had set out for routine collection and disposal by the trash collector. Judge Cutler erred when she granted Beltz's motion to suppress the evidence the police obtained following the warrantless search of Beltz's trash.

The order of the superior court granting Beltz's motion to suppress is REVERSED.

---

**45.** *See* 1 LaFave, *Search and Seizure*, § 2.6(c) at 696–97 (noting that "in light of *California v. Greenwood* ... the Supreme Court would agree with the result [of the Alaska Supreme Court's decision] in *Smith*. ... In reaching [its holding that Greenwood had no reasonable expectation of privacy in his trash], the Court recognized *both* (i) that 'bags left on or at the side of a public street are readily accessible to ... members of the public'; and (ii) that the defendant had put out his garbage 'for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so'") (citations omitted).